# 17-cv-03424-DLC

**United States District Court**

*for the*

**Southern District of New York**

SHINHAN BANK,

*Appellant,*

-against-

LEHMAN BROTHERS HOLDINGS INC. *and*
LEHMAN BROTHERS SPECIAL FINANCING INC.

*Appellee.*

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (CHAPMAN, J.)

IN RE LEHMAN BROTHERS HOLDINGS INC. CASE NO. 08-13555

## APPELLANT'S REPLY BRIEF

K&L GATES LLP
John A. Bicks
Henry E. Shin
Robert T. Honeywell
Priya Chadha
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 536-3900
Facsimile: (212) 536-3901

K&L GATES LLP
Brian D. Koosed
1601 K Street, NW
Washington, DC 20006
Telephone: (202) 778-9000
Facsimile: (202) 778-9100

*Attorneys for Appellant Shinhan Bank*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..............................................................................1

ARGUMENT .......................................................................................................4

    I.    The Bankruptcy Court Erred Because the Undisputed Record
        Evidence Shows There Was No Binding "Settlement"
        Between the Parties As of April 20, 2016............................................4

        A.    The Undisputed Record Evidence Clearly Shows That
                the Parties Intended to Commit Their Settlement
                Agreement to Writing. ...............................................................4

        B.    No Binding Settlement Agreement Could Have Existed
                as of April 20, 2016 Because Essential Terms Were
                Missing. ....................................................................................12

    II.    The Bankruptcy Court Further Erred Because the Parties
        Made Clear in the Agreement That They Did Not Intend to Be
        Bound to Their Written Settlement Agreement Until the
        Agreement Was Fully Signed. ..........................................................14

    III.    LBSF Admits That Its "Moral Hazard" Argument is
        Speculation Unsupported by the Record; It is Therefore
        Entitled to No Weight. ......................................................................17

CONCLUSION ..................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*B. Lewis Productions, Inc. v. Angelou*,
No. 01 Civ. 0530 (MBM), 2005 U.S. Dist. LEXIS 9032 (S.D.N.Y.
May 12, 2005) ..........................................................................................7

*Ciaramella v. Reader's Digest Ass'n*,
131 F.3d 320 (2d Cir. 1997) ..................................................................10

*Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*,
74 N.Y.2d 475 (N.Y. 1989) ...................................................................12

*Conway v. Brooklyn Union Gas Co.*,
236 F. Supp. 2d 241 (E.D.N.Y. 2002) ...................................................17

*Delyanis v. Dyna-Empire, Inc.*,
465 F. Supp. 2d 170 (E.D.N.Y. 2006) ...................................................17

*Hostcentric Techs., Inc. v. Republic Thunderbolt, LLC*,
No. 04 Civ. 1621 (KMW) (AP), 2005 WL 1377853 (S.D.N.Y.
June 9, 2005) ...........................................................................................1y

*Kaczmarcysk v. Dutton*,
414 F. App'x. 354 (2d Cir. 2011) ....................................................10, 17

*N. Fork Country, LLC v. Baker Publ'ns, Inc.*,
436 F. Supp. 2d 441 (E.D.N.Y. 2006) ...................................................17

*R.G. Grp., Inc. v. Horn & Hardart Co.*,
751 F.2d 69 (2d Cir. 1984) ......................................................................6

*S.E.C. v. Credit Bancorp, Ltd.*,
232 F. Supp. 2d 260 (S.D.N.Y. 2002) ...................................................19

*Walker v. City of New York*,
No. 05 Civ. 0004 (JBW) (JMA), 2006 WL 1662702 (E.D.N.Y.
June 15, 2006) ........................................................................................17

*Winston v. Mediafare Entm't Corp.*,
    777 F.2d 78 (2d Cir. 1985) ....................................................................10, 12, 13

Shinhan[1] respectfully submits this reply in further support of its appeal from the Bankruptcy Court's March 29, 2017 Order.

## PRELIMINARY STATEMENT

LBSF's opposition to this appeal relies almost exclusively on the fiction that on April 20, 2016, the parties had a binding settlement agreement. *See generally* ECF No. 9 ("LBSF Br."). Yet LBSF cannot explain the undisputed evidence that, starting April 21, 2016, the parties engaged in extensive, weeks-long efforts to negotiate and document a settlement agreement. In effect, then, LBSF argues that the parties had a binding contract before they even started carefully negotiating the terms of the contract. This makes no sense chronologically and defies the most basic elements of contract law. LBSF, and the Bankruptcy Court below, have essentially concluded that LBSF and Shinhan had a binding contract because, in their view, LBSF and Shinhan "should" have one – even before it is signed. There is no support for such a theory here.

It is undisputed that the draft Agreement between LBSF and Shinhan – which Shinhan never signed – contains two express provisions, Sections 4 and 5, which clearly and unambiguously state that the Agreement is not binding until fully signed. As Shinhan showed in its opening brief, these two provisions alone are dispositive under controlling Second Circuit precedent and require reversal of

---

[1]      Capitalized terms not defined herein shall retain the meaning ascribed to them in Shinhan's Opening Brief, filed May 22, 2017. *See* ECF No. 6 ("Op. Br.").

the Bankruptcy Court's Order.  *See* Op. Br., pp. 21-24.  As Shinhan also showed, the Agreement contains numerous other provisions that courts have repeatedly held reflect an intent not to be bound without a signed writing.  *Id.* at 24-28.  These, too, are fatal to the Bankruptcy Court's Order.

Tacitly acknowledging that the Agreement, by its terms, is not binding without Shinhan's signature, LBSF does its best to avoid discussing the Agreement altogether in its response.  *See* LBSF Br.  Indeed, because the very first draft of the Agreement, which LBSF sent to Shinhan on April 21, 2016, contained various provisions that make clear that the parties could not be bound without a fully signed writing, LBSF also simply chooses to ignore most of what happened between the parties on or after April 21, 2016.

As a result, LBSF focuses almost exclusively on April 20, 2016, the date that the parties accepted the Mediator's proposal as to the Settlement Amount, claiming that:  (i) the parties were bound to a "settlement" upon accepting the Mediator's proposal; (ii) the April 20, 2016 "settlement" was "separate" from the parties' written Agreement; and (iii) that written Agreement "does not set forth the terms and conditions of the Settlement."  *See* LBSF Br., pp. 8, 13-14.  This argument makes no sense, runs contrary to established case law, and is belied by the undisputed evidence, including what the Agreement actually says.  Consider:

*First*, the parties' Stipulation of undisputed facts makes clear that the Mediator's proposal as to the Settlement Amount did not address any terms other than the Settlement Amount.  *See* App. 55-56 (Stip., ¶¶ 1-4).  There is simply no evidence in the undisputed record that the parties *ever* discussed any terms other than the Settlement Amount, let alone agreed to any of them, as of April 20, 2016.  *See id.*

*Second*, LBSF's claim is belied by, among other things, the Mediator's own statements on April 20, 2016.  Upon hearing the parties had accepted his proposal as to the Settlement Amount, the Mediator instructed LBSF to send Shinhan "settlement documentation . . . for [Shinhan's] review" and then told the parties to "conclude [the] matter promptly."  *See* App. 55-56, 64 (Stip., ¶ 3 & Ex. B).  Far from showing they were bound as of April 20, the Mediator's instructions made clear that the parties had more work to do thereafter to reach a binding agreement.

*Third*, as noted, LBSF first sent Shinhan a draft Agreement on April 21, 2016.  From that very first draft, the terms of the Agreement demonstrated that LBSF, like Shinhan, viewed the written Agreement as the parties' *only* settlement agreement.  Indeed, the Agreement stated as much, providing, among other things, that:  (i) the Agreement "constitutes the entire agreement . . . of the Parties relating to the subject matter hereof"; and (ii) no party is "relying upon any . . . agreements other than" the parties' written Agreement.  App. 79, 81 (Stip., Ex. D, §§ 2, 11).

None of these undisputed facts can be squared with LBSF's current claim – concocted solely for this dispute – that the written Agreement was a "separate" contract that "does not set forth the terms and conditions of the Settlement."  LBSF Br., pp. 13-14.  Tellingly in this regard, LBSF cannot and does not identify a single term of the purported "settlement" that is not covered by the Agreement.  *See* LBSF Br.  Nor could LBSF:  no such term exists.  Instead, the undisputed evidence makes clear that there never was any "settlement" separate and apart from that set out in the parties' written – but unexecuted – Agreement.

The Bankruptcy Court ignored these facts and the Agreement's many provisions that reflect the parties' intent to be bound only by a fully signed writing. Instead, the Bankruptcy Court blindly adopted LBSF's position that the parties had a binding "settlement" as of April 20, 2016.  This was clear error.  The Bankruptcy Court's Order should be reversed and judgment should be entered for Shinhan.

## **ARGUMENT**

I. **The Bankruptcy Court Erred Because the Undisputed Record Evidence Shows There Was No Binding "Settlement" Between the Parties As of April 20, 2016.**

A. **The Undisputed Record Evidence Clearly Shows That the Parties Intended to Commit Their Settlement Agreement to Writing.**

In its brief, LBSF asks the Court to reject the "faulty premise that the 'Release Agreement' was intended to be a memorialization of the parties' prior settlement negotiations."  LBSF Br., p. 8.  The Court should do no such thing,

because all of the undisputed evidence demonstrates conclusively that the document entitled "Release Agreement" (i.e., the parties' written Agreement) was unequivocally intended by the parties to be the sole memorialization of their complete agreement resolving the Adversary Proceeding.

LBSF's claims to the contrary are flatly contradicted by the undisputed evidence, which clearly demonstrates, among other things, that:  (i) the parties did not enter into a binding settlement agreement on April 20, 2016, when they accepted the Mediator's proposal as to the Settlement Amount, but instead intended to, and in fact did, work to negotiate a comprehensive settlement document in the weeks following April 20, 2016; (ii) the parties expressed throughout the drafting of their comprehensive settlement agreement – numerous times, and in writing – that they did not intend to be bound until they had reduced their settlement agreement to a fully signed writing; and (iii) LBSF's consistent practice in settling disputes with Adversary Proceeding defendants was to prepare and execute a comprehensive settlement agreement like the Agreement negotiated with Shinhan.

*First*, contrary to LBSF's claims, the Mediator's April 20, 2016 email correspondence nowhere suggested that the parties were bound to a "Settlement" as of that date.  *See* LBSF Br., pp. 10 - 11.  After advising the parties that each had accepted his proposal as to the Settlement Amount, the Mediator's email stated:

> Because Lehman has routine settlement documentation, *I ask Lehman to provide the documentation to Shinhan for its review. Please conclude this matter promptly. Inform me of any problems or delays.*

App. 64 (Stip., Ex. B) (emphasis added).[2]

It is hard to see why the Mediator would instruct LBSF to send Shinhan "settlement documentation," or why Shinhan would need to "review" such documentation, if, as LBSF claims, the parties were bound to a "Settlement" immediately upon receiving the Mediator's email on April 20, 2016. Indeed, the Mediator's instructions to "conclude this matter promptly" and to "inform [him] of any problems or delays" further contradict LBSF's claim. App. 64 (Stip., Ex. B). As those statements make clear, the parties' settlement was not, in fact, "conclude[d]" as of April 20, 2016; rather, it was possible that the remaining steps in the process could lead to "problems," as actually occurred here. *Id.* Simply put, the Mediator's April 20 email cannot be squared with LBSF's claim that the parties had a complete and binding "Settlement" merely upon receipt of that email and irrespective of any "settlement documentation" to be prepared and signed.

---

[2]      LBSF makes much of the fact that Shinhan did not explicitly reserve its right not to be bound in the absence of a written agreement when it advised the Mediator that Shinhan had accepted the Mediator's proposal as to the Settlement Amount or in subsequent correspondence. *See* LBSF Br., pp. 10-11. But as Shinhan explained in its Opening Brief, courts cannot limit their analysis of the parties' intent to a specific piece of correspondence or a specific time period, because the Second Circuit has held that "it does not matter whether the signal is given during the course of bargaining, or at the time of the alleged agreement." *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir. 1984). Here, as Shinhan explained in its opening brief, multiple provisions of the Agreement – including provisions added by Shinhan and accepted by LBSF during negotiations – reflect the parties' reservation of their right not to be bound until they had a fully signed writing. *See* Op. Br., pp. 21-28.

*Second*, on April 21, 2016, the day after the Mediator instructed LBSF to send Shinhan "settlement documentation," LBSF emailed Shinhan the first draft of the Agreement.  This plainly shows, consistent with the Mediator's instructions, that the settlement was not "conclude[d]" on April 20, 2016 and that the parties were instead working towards concluding a settlement.  Indeed, LBSF's circulation of a draft agreement as instructed by the Mediator shows that, regardless of what the draft was titled or what LBSF now claims, LBSF at the time viewed the Agreement the same way that Shinhan did:  as "settlement documentation" that would ultimately reflect the parties' complete settlement agreement in a single, integrated writing, and not merely document their respective releases.

LBSF's reliance in this regard on the Agreement's title of "Release Agreement" is misplaced.  LBSF Br., p. 14.  "[T]he nature of an agreement is not limited by the label affixed to it."  *B. Lewis Prods., Inc. v. Angelou*, No. 01 Civ. 0530 (MBM), 2005 U.S. Dist. LEXIS 9032 at *12 (S.D.N.Y. May 12, 2005).  In other words, the Agreement's title does not determine its legal effect; its terms do.

Here, the Agreement's terms expressly refute LBSF's claim that the Agreement was "separate" from the parties' "Settlement" and "does not set forth the terms and conditions of the Settlement."  LBSF Br., p. 14.  Far from it, the Agreement contains multiple provisions that relate only to the parties' settlement, not their respective releases.  Consider:

•   The Agreement's final recital paragraph states that, "as of the date hereof, the parties have agreed to . . . the Settlement Amount."  App. 78 (Stip., Ex. D, p. 2).  Notably, the Agreement does not state that the parties agreed to that Amount "as of April 20, 2016," when the parties accepted the Mediator's proposal, but rather states the parties were agreeing to the Settlement Amount "as of the date hereof," i.e., as of the date of the Agreement, which Section 4 defines as the date that Shinhan signs it.  App. 78, 80 (Stip., Ex. D, p. 2, § 4).

•   Section 1 of the Agreement sets forth Shinhan's deadline for paying the Settlement Amount (10 Korean business days after Shinhan signed the Agreement) and the mechanism therefor.  *Compare* App. 78-79 (Stip., Ex. D, § 1), *with* App. 55-56, 60-64 (Stip., ¶¶ 1-3 & Exs. A-B).

•   Section 3 of the Agreement sets forth LBSF's obligation to dismiss Shinhan from the Adversary Proceeding following receipt of the Settlement Amount.  *Compare* App. 79 (Stip., Ex. D, § 3), *with* App. 55-56, 60-64 (Stip., ¶¶ 1-3 & Exs. A-B).

•   Section 6 provides that the parties' settlement agreement will be governed by New York law.  *Compare* App. 80 (Stip., Ex. D, § 6), *with* App. 55-56, 60-64 (Stip., ¶¶ 1-3 & Exs. A-B).

•   Section 8 provides that neither party can disclose the Settlement Amount except under limited circumstances.  *Compare* App. 81 (Stip., Ex. D, § 8), *with* App. 55-56, 60-64 (Stip., ¶¶ 1-3 & Exs. A-B).

These are the essential terms of the parties' *settlement* agreement, and the undisputed evidence shows that all of these essential terms, except for the Settlement Amount itself, were first proposed on April 21, 2016, when LBSF circulated the initial draft of the Agreement.  *See* App. 55-56, 64, 73, 77 (Stip., ¶¶ 1-4 & Ex. B & Ex. C, p. 8 & Ex. D).  LBSF's claims – that "the Mediator's proposal [agreed to on April 20, 2016] . . . contained all material terms of the settlement between the parties," and that the parties' written Agreement "does not

- 8 -

set forth the terms and conditions of the Settlement" – are totally undercut by these express provisions and cannot be squared with the undisputed evidence.  LBSF Br., pp. 4-5, 14.

Simply put, if the parties had only intended to prepare a written agreement that addressed their respective releases, as LBSF claims, there was no need for the Agreement that they undisputedly prepared, which precisely describes all of the parties' rights and obligations as to the settlement, and for the dismissal of the Adversary Proceeding.  Indeed, under LBSF's theory of a "Settlement" separate and apart from a "Release Agreement" limited to the parties' respective releases, the parties could have simply executed a Blumberg form release on April 21, 2016, immediately after receiving the Mediator's April 20, 2016 email.  The parties did not do so, and the fact that they did not – and instead embarked upon a weeks-long effort to negotiate and document the terms of the Agreement – is telling here.

Moreover, as Shinhan detailed at length in its opening brief, the Agreement contains numerous other provisions reflecting that the parties contemplated a written settlement agreement (i.e., the Agreement) and did not intend to be bound until that written Agreement was fully signed.  *See* Op. Br., pp. 21-28; App. 77 (Stip., Ex. D).   These provisions included Sections 4 and 5, as well as the

Agreement's merger clause[3] and its clause requiring that any amendments be in a signed writing. *Id.* None of these provisions are consistent with LBSF's theory of a "Settlement" as of April 20, 2016 separate and apart from the written Agreement.

*Third*, reducing settlement agreements to writing is consistent with what Shinhan understands to be the requirements for settling claims against Adversary Proceeding defendants and with LBSF's practices in doing so. The Bankruptcy Court's ADR Order – which governed the mediation between Shinhan and LBSF – expressly provides that, if a party receives an ADR Notice and agrees to settle a demand, it must state that in writing and "[t]he Parties will then *execute a settlement* and general release (including a confidentiality provision), and the Chapter 11 Estate shall dismiss the corresponding Action with prejudice *upon execution of the release*." App. 16 (ADR Order, § 8(b)(i) (emphasis added)).[4]

---

[3]    LBSF argues that "the merger clause has no effect here because the Release Agreement was not signed" and that Shinhan is trying to have it "both ways." LBSF Br. at 15. This argument makes no sense and, if adopted, would effectively negate the first factor of the Second Circuit's *Winston* analysis, which by definition requires courts to look at the text of unsigned agreements to discern whether the parties intended not to be bound without a signed writing. *See, e.g., Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 81-82 (2d Cir. 1985) (examining terms in unsigned agreement); *Ciaramella v. Reader's Digest Ass'n*, 131 F.3d 320, 324-25 (2d Cir. 1997) (same); *Kaczmarcysk v. Dutton*, 414 F. App'x. 354, 355-56 (2d Cir. 2011) (same). LBSF's desperate efforts to avoid the plain language of the Agreement – and the wealth of controlling case law requiring courts to analyze that language as part of any *Winston* analysis – underscore the fundamental errors at the heart of the Bankruptcy Court's Order.

[4]    Though Shinhan did not agree to settle LBSF's demand in the ADR Derivatives Notice and instead chose to go to mediation, there is no logical reason why LBSF would use a different process for parties that settled their claims following mediation instead of immediately upon receipt of a settlement demand from LBSF.

Here, the Agreement complies with the ADR Order's requirements:  it is a settlement and general release with a confidentiality provision, and it provides that the Adversary Proceeding will be dismissed against Shinhan after execution.  *See generally* App. 77 (Stip., Ex. D). Shinhan is aware of no settlement that LBSF has entered into without such a fully signed writing, let alone one based upon a mere email acceptance of a mediator's proposal of a settlement amount.  The Mediator's reference in his April 20 email to LBSF's "routine settlement documentation" in this regard further confirms what Shinhan understands to be LBSF's consistent practice of entering into written settlement agreements.  *See* App. 64 (Stip., Ex. B).

In sum, the undisputed evidence shows that the parties' April 20, 2016 acceptance of the Mediator's proposal as to the Settlement Amount did not constitute a binding settlement and, instead, that both parties always intended to negotiate and enter into a written settlement agreement.  The Agreement that the parties then negotiated clearly indicated that it was the parties' "entire agreement" and was not binding until fully signed.  *See* Op. Br., pp. 21-28.  The Bankruptcy Court ignored these facts in its Order, instead blindly adopting LBSF's unsupported theory of "separate" agreements.  For this reason alone, the Order should be reversed.

**B.**     No Binding Settlement Agreement Could Have Existed as of April 20, 2016 Because Essential Terms Were Missing.

LBSF's claim of a separate "Settlement" as of April 20, 2016 is further flawed because no binding settlement could have existed as of that date.  As briefly noted above, the parties' Stipulation reflects that, as of April 20, 2016, the parties had only reached an agreement as to the Settlement Amount and had not even discussed any other term of a potential settlement.  *See* App. 55-56 (Stip., ¶¶ 1-4).[5] Despite this undisputed fact, LBSF urges this Court to hold that the parties entered into a binding settlement agreement on April 20, 2016, citing the proposition that "courts should not be pedantic or meticulous in interpreting contract expressions." LBSF Br., pp. 16-20 (citing *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483 (N.Y. 1989) (internal quotations omitted)).

This argument fails because it runs directly counter to the Second Circuit's instructions in *Winston*.  There, the Second Circuit warned that "[i]t is not for the court to determine retrospectively that at some point in the evolution of a formal document that the changes being discussed became so 'minor' or 'technical' that the contract was binding despite the parties' unwillingness to have it executed and

---

[5]     LBSF's claims – that the Mediator's proposal (a) included the payment of the Settlement Amount "in exchange for mutual releases" and (b) "contained all material terms of the settlement between the parties" – are not supported by the record evidence.  *See* LBSF Br., pp. 4-5 (citing App. 55-56, 61, 64 (Stip., ¶¶ 2-3 & Exs. A-B)).  In both instances, the cited portions of the record only reflect that the parties had discussed and agreed upon the Settlement Amount as of April 20, 2016, nothing more.  *See id.*

delivered." 777 F.2d at 83. Rather, that these open terms "may in the long view be fairly characterized as minor or technical does not mean that a binding contract was formed prior to the time that they were finally worked out." *Id.* at 82. In other words, in conducting a proper *Winston* analysis, courts *should* be meticulous when construing open terms, particularly when determining the critical issue of when, in their negotiations, the parties intended to be bound to an agreement. *Winston* demands nothing less.

Here, as Shinhan established in its opening brief, the purported April 20, 2016 "Settlement" lacked numerous essential terms such as the timing of and mechanisms for paying the Settlement Amount, the scope of the parties' releases, the choice of governing law, the timing of and conditions for effectiveness, and confidentiality.[6] *See* Op. Br., pp. 15-16. Each of those essential terms is expressly laid out in the parties' written Agreement; not a single one of them was discussed or agreed to as of April 20, 2016. *See* App. 77-81 (Stip., Ex. D); *supra*, pp. 7-9. Simply put, no binding agreement could have existed as of that date. The Bankruptcy Court's holding otherwise was error. Its Order should be reversed.

---

[6] LBSF contends that the cases Shinhan cited in support of this argument require "active disagreement" as to open terms, but LBSF fails to cite any cases supporting this alleged requirement. LBSF Br., p. 18. In any event, LBSF's argument makes little sense. Where, as here, the undisputed evidence shows that parties have not even discussed a particular contract term, they have no way of knowing whether they will agree or disagree on it and, accordingly, they can hardly be said to have reached a meeting of the minds on it. *See* App. 55-56 (Stip., ¶¶ 1-4).

**II.**   **The Bankruptcy Court Further Erred Because the Parties Made Clear in the Agreement That They Did Not Intend to Be Bound to Their Written Settlement Agreement Until the Agreement Was Fully Signed.**

As Shinhan explained in its opening brief, the Bankruptcy Court ignored the Agreement's multiple provisions reflecting the parties' unambiguous intent not to be bound to a settlement without a fully signed writing.  *See* Op. Br., pp. 21-28.  In response, LBSF focuses on Sections 4 and 5 of the Agreement, both of which expressly state that the Agreement must be signed to be effective, arguing that:  (i) those provisions "***cannot*** undermine the parties' already binding Settlement"; and (ii) the Bankruptcy Court correctly found that those provisions only address the effectiveness of LBSF's release of Shinhan.  LBSF Br., pp. 11-14 (emphasis in original).  Neither argument holds water.

*First*, as noted above, there was no such "already binding Settlement" between the parties as of April 20, 2016.  *Supra*, pp. 4-13.  Far from it, the parties always intended to reduce their settlement agreement to a signed writing and, indeed, expressly required as much in the Agreement.  *See id.*

The drafting history of Section 4 of the Agreement is particularly instructive in this regard.  It is undisputed that, in response to LBSF's first draft of the Agreement sent on April 21, 2016, Shinhan proposed certain revisions on May 11, 2016.  *See* App. 56, 72 (Stip., ¶ 5 & Ex. C, p. 7).  Shinhan's proposed revisions included changes to Section 4 of the Agreement to require that the Agreement be

executed in hard copy form "due to internal [Shinhan] regulations." *Id.* Due to the mechanics of signing the Agreement in hard copy form, Shinhan further revised Section 4 "so that the Agreement is dated as of the date that Shinhan executes its respective hard copies" and thus proposed that Section 4 state that "*this Release Agreement shall become effective and valid upon such execution.*" *See* App. 72, 80 (Stip. Ex. C, p. 8 & Ex. D, § 4) (emphasis added).

LBSF quickly agreed to these proposed revisions on May 12, 2016 without complaint or comment. *See* App. 56, 71 (Stip., ¶ 6 & Ex. C, p. 6). LBSF's prompt agreement to these terms – including Shinhan's addition of express language requiring that the Agreement be signed in hard copy form and stating that it would "become effective and valid" upon Shinhan's execution – in May 2016 belies LBSF's current position that the parties had an "already binding Settlement" as of April 20, 2016.

*Second*, and as Shinhan also noted in its opening brief, LBSF's interpretation – that Sections 4 and 5 of the Agreement merely provide that LBSF's release becomes effective upon receipt of the Settlement Amount, nothing more – cannot be squared with the Agreement's plain language. Initially, Section 4's express statement that the Agreement "shall become effective and valid upon [Shinhan's] execution" has nothing to do with the Settlement Amount or LBSF's release; indeed, neither are mentioned anywhere in Section 4. *See* Op. Br., p. 23. LBSF's

interpretation – which the Bankruptcy Court adopted hook, line, and sinker – thus completely writes Section 4 out of the Agreement.  That is simply not the law.  *See id*.  Indeed, LBSF's brief does not even address, let alone attempt to defend the Bankruptcy Court's disregard of, the numerous other provisions in the Agreement reflecting the parties' intent not to be bound without a fully signed writing.  *See id*. at pp. 24-28 (citing at least eight (8) different provisions of the Agreement and case law supporting same); *see also* LBSF Br., pp. 11-15.

Finally, LBSF's sole complaint with Shinhan's interpretation of Sections 4 and 5 of the Agreement – that it permits "an absurd result" by which Shinhan could sign the Agreement but "delay payment to LBSF indefinitely" – misses the mark. Any such effort by Shinhan would violate Section 1 of the Agreement, which requires Shinhan to pay LBSF the Settlement Amount within ten Korean business days after signing.  *See* LBSF Br., p. 13; App. 78-79 (Stip., Ex. D, § 1).

In sum, the Bankruptcy Court's Order, which blindly adopted LBSF's unsupported and unsupportable interpretation of the Agreement, does not withstand scrutiny.  Nor does it comport with controlling Second Circuit precedent. It is not exaggeration – or "hyperbolic[]" as LBSF puts it – to note that the Bankruptcy Court's Order here was unprecedented.  *See* LBSF Br., p. 11 n.6. Despite a diligent search, *Shinhan is aware of no case* since *Winston* was decided in 1985 that enforced an oral agreement where the parties' only draft agreement

contained the kind of unequivocal language set forth in Sections 4 and 5 here.  Nor does LBSF cite a single case in this regard in support of the Bankruptcy Court's Order.[7]  *See generally* LBSF Br.

This alone is dispositive under controlling Second Circuit precedent.  *See, e.g.*, *Kaczmarcysk*, 414 F. App'x at 355 ("[W]here there is a writing between the parties showing that [one party] did not intend to be bound . . .  a court need look no further than the first [*Winston*] factor.") (internal citations omitted).   The Bankruptcy Court's Order should therefore be reversed.

### III.   LBSF Admits That Its "Moral Hazard" Argument is Speculation Unsupported by the Record; It is Therefore Entitled to No Weight.

Unable to rely on the plain language of the Agreement or to defend the Bankruptcy Court's interpretation of it, LBSF concludes its brief by attempting to convince this Court to look beyond – and, indeed, to disregard – the Agreement's plain terms.  *See* LBSF Br., pp. 22-25.  Specifically, LBSF resorts to a series of hints and innuendo in an effort to invoke the supposed "moral hazard" resulting

---

[7]     Indeed, none of the cases LBSF relies upon involve a draft agreement with anything like the express reservation of rights in Sections 4 and 5 of the Agreement.  *See generally* LBSF Br. (citing *Conway v. Brooklyn Union Gas Co.*, 236 F. Supp. 2d 241 (E.D.N.Y. 2002); *N. Fork Country, LLC v. Baker Publ'ns, Inc.*, 436 F. Supp. 2d 441, 446 (E.D.N.Y. 2006); *Hostcentric Techs., Inc. v. Republic Thunderbolt, LLC*, No. 04 Civ. 1621 (KMW) (AP), 2005 WL 1377853 (S.D.N.Y. June 9, 2005); *Delyanis v. Dyna-Empire, Inc.*, 465 F. Supp. 2d 170 (E.D.N.Y. 2006); and *Walker v. City of New York*, No. 05 Civ. 0004 (JBW) (JMA), 2006 WL 1662702 (E.D.N.Y. June 15, 2006)).  This glaring omission effectively proves Shinhan's point – despite LBSF's claims to the contrary, to Shinhan's knowledge no New York court since 1985 has ever enforced an unsigned settlement agreement with an explicit reservation of rights like those set forth in Sections 4 and 5 here.

from Shinhan's purported "unilateral delay" in signing the Agreement.  *Id.*  But LBSF openly admits that:  (i) it "does not allege that Shinhan purposefully delayed executing the Release Agreement"; (ii) there is accordingly no evidence of any such intentional delay on Shinhan's part; and (iii) there could never be any such evidence, because the parties did not take discovery and, in fact, have waived their right to do so here by their Stipulation.  *Id.* at p. 24, n.15; App. 55 (Stip., p. 2).  By its own admission, then, LBSF's desperate "moral hazard" argument is completely unsupported by the record.  It is therefore entitled to no weight.

Under the undisputed facts to which the parties have stipulated, there is simply no evidence that either Shinhan or LBSF was attempting to "game" the system in any way.  Shinhan does not dispute that its strict internal approval process took longer than expected, which ultimately led to the fact pattern here, where the BofA Order was issued just days before Shinhan anticipated signing the Agreement.  But, as LBSF admits, there is no evidence that such delay was intentional.  *See* LBSF Br., p. 24, n.15.  Moreover, nothing in the undisputed record suggests that LBSF had any contemporaneous concern with the delay.  *See generally* App. 57, 67-68 (Stip., ¶¶ 10-13 & Ex. C, pp. 2-3).  At no point did LBSF attempt to set a deadline for Shinhan's execution of the Agreement or otherwise demand that Shinhan sign.  *See id.*  Instead, LBSF was content throughout June

2016 simply to ask for status updates as to when Shinhan would sign the Agreement. *See id.*

LBSF is a sophisticated party represented by competent counsel. It should not be able to shirk the consequences of an agreement that it negotiated with "eyes wide open" simply because it realized, after the fact, that the undisputed agreement had unforeseen consequences. *See S.E.C. v. Credit Bancorp, Ltd.*, 232 F. Supp. 2d 260, 267 (S.D.N.Y. 2002) (enforcing terms of settlement agreement despite claims of unfairness by one party because, in part, it was entered into by "by sophisticated parties represented by able counsel"). Shinhan was upfront about its requested changes to the Agreement and explicitly noted, both in its emails to LBSF and in its proposed changes themselves, that Shinhan's proposed changes to Section 4 necessitated that the Agreement would become effective only once Shinhan executed it in hard copy form. *See* App. 56, 72, 80 (Stip., ¶ 5 & Ex. C, p. 7 & Ex. D, § 4). LBSF quickly accepted that proposed change. *See* App. 56, 71 (Stip., ¶ 6 & Ex. C, p. 6). LBSF cannot now argue that its own failure to think through the consequences of its acceptance is an adequate reason to disregard the plain terms of the Agreement.

Finally in this regard, both LBSF's and the Bankruptcy Court's reliance on Shinhan's statements that it intended to sign the Agreement prior to receiving the BofA Order is misplaced. LBSF Br., pp. 6, 10-11; App. 57, 67-68 (Stip., ¶¶ 10-13

& Ex. C, pp. 2-3).   Shinhan does not dispute that, until the Bankruptcy Court issued the BofA Order, it intended to sign the Agreement.   But that is utterly irrelevant to this dispute.   The only issue here is *when* the parties agreed that they would be bound to a settlement.   And no matter how many times Shinhan told LBSF it planned to sign the Agreement, the Agreement made clear that it would only be binding upon Shinhan once Shinhan actually signed it.   Shinhan never did.   As a result, without its signature, Shinhan never was, nor could be, bound to the Agreement.   The Bankruptcy Court erred in ruling otherwise and crediting LBSF's speculative and unsupported "moral hazard" argument.   This Court should recognize that argument for what it is:   a post-hoc litigation effort to ignore the plain, unambiguous terms of the Agreement in order to avoid an undesired result.

## <u>CONCLUSION</u>

For the foregoing reasons, Shinhan respectfully asks this Court to reverse the

Bankruptcy Court's Order granting LBSF's Motion and remand this matter to the

Bankruptcy Court for entry of judgment in Shinhan's favor.

Dated:  June 19, 2017               <u>/s/ John A. Bicks</u>
     New York, NY                 John A. Bicks
                                        Henry E. Shin
                                        Robert T. Honeywell
                                        Priya Chadha
                                        K&L GATES LLP
                                        599 Lexington Avenue
                                        New York, NY 10022
                                        Telephone: (212) 536-3900

                                        Brian D. Koosed
                                        K&L GATES LLP
                                        1601 K Street, NW
                                        Washington, DC 20006
                                        Telephone: (202) 778-9000

                                        *Attorneys for Shinhan Bank*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York and the type-volume limitation of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B) because this brief contains 5,305 words, excluding the parts of the brief exempted by Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(iii).

Dated:  June 19, 2017
       New York, NY

/s/ John A. Bicks
John A. Bicks
Henry E. Shin
Robert T. Honeywell
Priya Chadha
K&L GATES LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 536-3900

Brian D. Koosed
K&L GATES LLP
1601 K Street, NW
Washington, DC 20006
Telephone: (202) 778-9000

*Attorneys for Shinhan Bank*